UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X

ETHEL RICHARDS,

                     Plaintiff,

        -against-

NEW YORK CITY DEPARTMENT OF
EDUCATION,

                    Defendant.

-------------------------------------------------------------- X

13-CV-16 (VEC)

OPINION & ORDER

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:_____
> DATE FILED:    7/10/2015

VALERIE CAPRONI, United States District Judge:

      Ethel Richards, a teacher employed by Defendant New York City Department of

Education (also known as the Board of Education of the City School District of the City of New

York ("BOE")) and a former Assistant Principal at the High School for Construction, Trades,

Engineering and Architecture ("CTEA"), brings this employment discrimination action against

her employer, alleging that she was discriminated against and demoted because of her sex, race,

and disability; that she was denied reasonable accommodations for her disability and her need to

attend to her dying mother; and that she was retaliated against when she voiced complaints

regarding the unfair actions taken against her.  Accordingly, she brings claims under Title VII of

the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; Title I of the Americans

with Disabilities Act ("ADA"), 42 U.S.C. § 12122 *et seq.*; the Family Medical Leave Act of

1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.*; the New York State Human Rights Law

("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*; and the New York City Human Rights Law

("NYCHRL"), N.Y. City Admin. Code § 8-101 *et seq.*  The BOE has moved for summary

judgment.  Because Richards has not offered any evidence in support of her claim that

discriminatory or retaliatory animus played any role in the events at issue, the BOE's motion is GRANTED.

## BACKGROUND

On August 25, 2008, Ethel Richards, a black female English teacher, was assigned to CTEA as an interim acting Assistant Principal. Def. Rule 56.1 Statement of Undisputed Material Facts ("56.1") ¶¶ 2, 5. Richards had a positive impression of the school when she began, and she enjoyed a good working relationship with the then-Principal, Quintin Cedeño. Richards Dep. at 69, 73. Richards was appointed Assistant Principal in January 2009, subject to a five-year probationary period. 56.1 ¶¶ 3-4. Cedeño was satisfied with Richards' performance throughout his tenure, Pischl Decl. Ex. Q, although some administrators – possibly including Cedeño – harbored doubts about her "interpersonal skills as an administrator," Wynn Dep. at 34.

In November 2009, Cedeño was abruptly removed from his post. 56.1 ¶ 7. Assistant Principal Steve Wynn, a white male who had been at CTEA before Richards arrived, was asked to step in for Cedeño until the BOE could find a suitable replacement. Wynn Dep. at 23-24.

On January 29, 2010, Lakeisha Gordon (née Johnson), a black female, became Interim Acting Principal of CTEA. *Id.* ¶¶ 8-9. It is undisputed that the relationship between Gordon and Richards deteriorated rapidly. Gordon quickly identified deficiencies[1] in Richards' performance. *Id.* ¶ 15. Gordon began giving Richards concrete deadlines for specific tasks. *Id.* ¶¶ 16-17. Gordon orally expressed dissatisfaction with Richards' judgment and chastised Richards for her poor handling of her colleagues, including a disagreement with a guidance counselor. *See* Richards Aff. Ex. K at 3.

---

[1]     The Court takes no position on the validity of Gordon's perception that Richards' performance as an Assistant Principal was "deficient."

On March 8, 2010, Gordon met with Richards regarding Richards' need to complete a number of discrete assignments in a timely manner.  Richards Aff. Ex. A.  While the parties dispute the extent to which Richards complied with Gordon's assignments, Gordon held numerous follow-up meetings with Richards and her union representative to discuss Richards' failure to adhere to the deadlines.  56.1 ¶ 18-19.  Richards concedes that she did not accomplish *all* of Gordon's directives, but in a theme that pervades this case, alleges that her failure was Gordon's fault because Gordon's assignments were unreasonable.  Pl. Local Rule 56.1 Counter-Statement of Facts ("Pl. 56.1 Resp.") ¶ 19.  On March 24, 2010, Gordon provided Richards with written feedback putting Richards on notice that she "need[ed] to improve [her] job performance and completion of all assigned duties in both a timely and accurate manner."  Pischl Decl. Ex. C.

The relationship between Richards and Gordon never recovered from its rocky start.  On Wednesday, April 7, 2010, Richards abruptly left a meeting that Gordon had scheduled. Richards Aff. Ex. K at 4.  Richards apparently answered a personal call during the meeting and then announced that her terminally-ill mother was in the emergency room and that she had to leave.[2]  56.1 ¶¶ 44-47, Pischl Decl. Ex. G.  On Friday – two days after Richards' mother's emergency – Gordon sought to chastise Richards for her departure, but Richards replied that she "did not have to listen to" Gordon; as a result, Gordon scheduled another disciplinary meeting with Richards' union representative.  Pischl Decl. Ex. F.  The disciplinary meeting, at which Gordon separately addressed Richards' unexcused absence and the "insubordination" that made Richards unable to "fulfill [her] duties as an Assistant Principal," occurred the following Monday.   Pischl Decl. Exs. E & F.  The "insubordination" that Gordon identified related to

---

[2]        The parties dispute what Richards said, but at this stage the Court interprets all disputed facts in the light most favorable to Richards.

Richards' failure to perform the tasks that Gordon had assigned Richards in March.  Pischl Decl. Ex. E.

Gordon's counselling of Richards had no positive effect.  On April 17, 2010, Gordon provided Richard's a written warning that if she did "not demonstrate sufficient professional growth, [she would] be rated Unsatisfactory for the 2009-2010 school year."  Pischl Decl. Ex. I; *see also* Richards Aff. Ex. K at 4.  By this time the relationship between Principal and Assistant Principal appears to have been hopelessly broken.  In addition to Gordon's insensitivity surrounding her mother's hospitalization, Richards was upset, *inter alia*, that Gordon had not provided her with a BOE-issued Blackberry (Richards had requested one on or around March 8, 2010, 56.1 ¶ 37), that the demands placed on her were "beyond any human capacity to complete," Richards Dep. at 124, and that Gordon had not given her sufficient time to recover from an injury that Richards sustained in early March, *id.* at 128.

Richards did not graciously accept her boss's criticism.  In March 2010, Richards wrote to Gordon complaining that she "was being treated unprofessionally and targeted," Richards Aff. Ex. B, that Gordon had "treated [Richards] as a whipping post – [she] yell[ed] at [Richards] and degrade[d] [her] in front of [her] colleagues," *id.*  Richards further complained that Gordon did not "provide her with [her] basic human rights to work in a hostile-free work environment."  *Id.* In April, Richards complained further to Gordon that Gordon was insufficiently accommodating her desire to take care of her terminally ill mother, Richards Aff. Ex. C.[3]

The hostility between Gordon and Richards boiled over in late April.  At a meeting in Gordon's office, the two had a run-in, unsurprisingly described very differently by the two parties.  Richards alleges that Gordon "bumped" her while "screaming in [her] face," causing

---

[3]      Despite Richards' complaints about Gordon's unwillingness to accommodate Richards' desire to spend more time dealing with her mother's failing health, there is no evidence that Richards sought FMLA leave to deal with her family's medical issues.

Richards to feel "very afraid."   Richards Dep. at 152.   Richards called 911 and recounted her version of the incident to the police, who interviewed her, Gordon, and Danielle Cummings, a BOE employee whom they identified as a witness.[4]  56.1 ¶¶ 72-75.  Although both the New York City Police Department ("NYPD") and the BOE's Office of Special Investigations ("OSI") investigated the altercation, neither investigation found that Gordon had assaulted or touched Richards; the OSI investigation specifically found that nothing happened.  *Id.* ¶¶ 76, 80; *see also* Pischl Decl. Ex. M.

During the investigation into the alleged assault, Richards was assigned to work outside of CTEA.  56.1 ¶ 79.  After the OSI investigation concluded that Gordon "did not physically push[] Ms. Richards," Pischl Decl. Ex. M, Richards returned to CTEA; she reported back to the school on September 27, 2010, 56.1 ¶ 81.

Richards' return to CTEA was not smooth.  First, based on her work in the 2009-2010 school year, Gordon gave Richards an "Unsatisfactory" rating.  *Id.* ¶¶ 82-83; *see* Pischl Decl. Ex. TT.  Moreover, upon return Richards learned that her previously-assigned office (Room 443) had been reassigned to a new Assistant Principal, Katherine Stahl, a white female.  Gordon Dep. at 130.  Richards complained to Gordon that Room 443 had been given to her as an accommodation for her disability.[5]  Gordon had her assistant send Richards the BOE's form on which employees request medical accommodations.  *See* Pischl Decl. Exs. R, S.

Beyond continued hostilities between Richards and Gordon, Richards met with a chilly reception from her colleagues when she returned to CTEA.  Several colleagues believed that she

---

[4]  Richards is not shy about filing police reports against her bosses at the BOE based on what she perceives to be discriminatory treatment, *see* Richards Dep. at 177, any more than she is about filing lawsuits, *id.* at 11-14.

[5]  When Richards was pregnant several years prior, she and Cedeño discussed an appropriate office; the two agreed that she should remain in Room 443, which was already her office.  Pischl Decl. Ex. Q.  Richards asserted that she continued to need accommodation after she was no longer pregnant and, although Gordon did not know that the room arrangement had been an accommodation, she "should have known or consulted with Plaintiff."  Pl. 56.1 Resp. ¶¶ 90-91.

had falsely accused the Principal of assault and that such an incident "indicate[d] she is capable

of manufacturing falsehoods" that could threaten their careers.  Wynn Dep. at 58; *see also* 56.1

¶¶ 93-96.[6]  Richards fed those concerns when she encouraged a student to make a statement

against a school aide and the student reported that Richards encouraged her to embellish the

facts.  56.1 ¶¶ 118-122.

   The relationship between Gordon and Richards continued its downward spiral.  On

Richards' first day back, she had a tense meeting with Gordon in which Gordon contended that

Richards "slammed [her] office door" in the face of Gordon and a witness.  Pischl Decl. Ex. W.

Richards responded that she "never slammed the door in [their] face," but instead that she "was

in fear as they both blocked [her] exit and [Richards] retreated to the furthest recesses of [her]

office space concerned and stressed."  Richards Aff. Ex. G.  The next day, at a group meeting,

the Principal asked everyone whether they would like to attend a specific professional

development program; Richards loudly responded that she would not until she was provided with

the training opportunities she requested the year before.  56.1 ¶ 99.  Richards' pattern of

unprofessional behavior, including another outburst in a different group meeting, continued the

following week.  Pischl Decl. Ex. W, Richards Aff. Ex. G.

   On October 22, 2010, Gordon sent Richards a disciplinary letter indicating that Richards

had failed to complete the school's Comprehensive Educational Plan ("CEP") by the deadline of

October 15, 2010.  Pischl Decl. Ex. X, 56.1 ¶¶ 103-11.  Although Richards concedes that she

was assigned the tasks and deadlines described in the letter, in her view, her failure to

accomplish the assignment on time was not her fault.  She contends that there were a number of

obstacles impeding her ability to complete the CEP on time, including the absence of some

---

[6]      Although she offers no evidence, Richards asserts that her three colleagues' representations are "not
credible."  Pl. 56.1 Resp. ¶¶ 93-96.

CTEA faculty with whom she needed to consult and the inability of her computer to process some of the files that Gordon provided to her.  Richards Aff. Ex. H.

On October 27, 2010, Richards and Gordon met to review the CEP that Richards had finally prepared.  56.1 ¶ 113.  Richards did not bring a paper copy of the CEP to the meeting and asked Gordon to print a copy for her.  Gordon refused to accommodate Richards and Richards refused to return to her office to retrieve the paper copy.  Having arrived at a standoff, Richards left Gordon's office without having discussed the CEP.  *Id.* ¶ 114.  Richards emailed Gordon an incomplete copy of the CEP later that day.  *Id.* ¶ 115.  In addition to several omissions, the CEP contained factually inaccurate statements describing programs that CTEA had discontinued and mischaracterizing the duration of classes.  *Id.* ¶ 116.  Gordon was forced to complete the CEP herself.  *Id.* ¶ 117.  Richards does not contend that she completed the CEP but continues to assert that it was "impossible" to complete the CEP on time.  Pl. 56.1 Resp. ¶ 116.

Gordon continued to document Richards' performance deficiencies.  She wrote a November 16, 2010 letter-to-file outlining Richards' "inappropriate use of DOE time" and her insistence on sending correspondence regarding unsettled administrative issues to faculty and staff.  Pischl Decl. Ex. AA.  Whenever Gordon disciplined Richards or criticized her work performance, Richards responded with her version of events.  Richards implored Gordon to treat her as she had "been treating the other Administrators in the school building," including by providing less guidance (which Richards characterized as micro-management) and fewer "unmanageable" tasks.  Richards Aff. Ex. I.  On September 30, 2010, Richards sent Gordon an email characterizing Gordon's treatment as harassment:

> Please let me know if you are emailing the other supervisors at the same rate you have been emailing me.  There is a disparaging difference, I feel, and your harassing behavior must come to an end.  Please reduce your email and try to focus on professional discourse instead.  My email is being blogged [sic] up and I can't respond to any of my teachers because of the volume of your emails.

*Id.*  This email followed a series of emails in which Richards wrote to Gordon  "I am trying to work in a non-toxic environment and you [Gordon] are making that impossible.  Again you are on a mission to destroy my career."  *Id.*  Richards described her boss as "cruel."  *Id.*

In November 22, 2010 – only a few months into the 2010-2011 school year – Gordon completed an evaluation of Richards' performance.  *Id.* ¶ 130; *see* Pischl Decl. Ex. UU.  Gordon rated Richards "Unsatisfactory" for that school year.  56.1 ¶ 131.  Having received two unsatisfactory ratings, Richards was discontinued from her probationary service as an assistant principal, and she reassumed her former role as a high school English teacher.  *Id.* ¶¶ 134-36.  Richards was removed from CTEA on November 29, 2010; she remains employed at a BOE school.  *Id.* ¶¶ 133, 136.

Even after she was removed from the Assistant Principal position, Richards continued to respond to some of Gordon's disciplinary letters.  *See, e.g.,* Richards Aff. Exs. D-G.  Richards' responses focused on what she perceived to be Gordon's unfair characterization of events.[7]  These ex-post responses make conclusory allegations that Gordon sought "to discriminate against [Richards], destroy [her] career and falsely U-Rate [her] performance."  Richards Aff. Ex. E.

Richards was not the only employee against whom Gordon took an adverse action.  Notably, Gordon hired three teachers as Assistant Principals – Tanya Addison, Michael Scadutl, and Katherine Stahl, Gordon Dep. at 56 – but later demoted Addison, who was black; *id.* at 61-62.  Approximately 12 minority women left CTEA during Gordon's first 4.5 years as Principal, *see* Gordon Dep. at 80-86, 105-11, albeit some voluntarily (for example, because they received a

---

[7]     For example, on January 19, 2011, Richards asserted that an April 2010 letter-to-file describing Richards' insubordination was retaliation for Richards' decision not to participate in CTEA's Saturday Academy Program. Richards Aff. Ex. D.

promotion at another school), *id*.  The record does not reflect CTEA's overall turnover during

that period, the demographics of the faculty and staff whom Gordon hired, or the number and

race of male teachers who left, voluntarily or involuntarily, during Gordon's first 4.5 years as

principal of CTEA.

During the five months when Richards had been temporarily removed from CTEA in

2010, she filed an internal complaint with the BOE's Office of Equal Opportunity Employment

("OEO"), charging unlawful discrimination based on race, sex, and disability.  56.1 ¶¶ 161-62.

On November 5, 2010, Richards filed a complaint with the Special Commissioner of

Investigation ("SCI"), alleging that Gordon had created a hostile work environment by

misreporting Richards' time and leave.  *Id.* ¶ 164.  SCI referred this complaint to OSI, which in

turn referred it to OEO.  *Id.* ¶¶ 154-66.  In February 2011, Richards filed a charge of disability-,

race-, and sex-based discrimination with the New York State Division of Human Rights and the

Equal Employment Opportunity Commission ("EEOC").  *Id.* ¶ 171.  She subsequently filed a

second complaint, charging retaliation.  *Id.* ¶ 173.  On October 4, 2012, the EEOC issued Right

to Sue letters, Compl. ¶ 15; Richards initiated this action on January 2, 2013.  Defendant moved

for summary judgment on all of Richards' claims.

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "'Where the

record taken as a whole could not lead a rational trier of fact to find for the nonmoving party,

there is no genuine issue for trial.'"  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal

quotation marks omitted)).  "The Court 'must construe the facts in the light most favorable to the

non-moving party and must resolve all ambiguities and draw all reasonable inferences against

the movant.'" *Pandora Media, Inc. v. Am. Soc. of Composers, Authors and Publishers*, 785 F.3d

73, 77 (2d Cir. 2015) (*per curiam*) (quoting *Beyer v. Cnty. of Nassau*, 524 F.3d 160, 163 (2d Cir.

2008)).  Nevertheless, "to defeat summary judgment, 'a nonmoving party must offer some hard

evidence showing that its version of the events is not wholly fanciful.'" *Chabad Lubavitch of*

*Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 197 n.10 (2d Cir. 2014)

(quoting *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005)).

## I.      Discrimination Based on Gender, Race, and Disability

Richards alleges that she was subjected to adverse employment actions and a hostile

work environment because she is a black woman regarded as having a disability, in violation of

Title VII, the ADA, the NYSHRL, and the NYCHRL, Compl. ¶¶ 70-75, 83, 85-86, 102-03, 110,

112-13, 118-20, 127.  She further alleges that Defendant did not offer reasonable

accommodations for her disability, in violation of the ADA, the NYSHRL, and the NYCHRL.

*Id.* ¶¶ 84, 111, 128.

### A.   There Is No Evidence of any Adverse Action Motivated by Gender, Race, or Disability

Richards contends that she was deprived of employment opportunities because of her

race, gender,[8] and perceived disability.  Because there is no evidence from which a factfinder

could infer discriminatory animus, however, she cannot state a *prima facie* case of

discrimination.

---

[8]       Although she pled a gender discrimination claim under Title VII and has pursued a theory of gender- and race-based discrimination throughout this action, in her brief, Richards omits any discussion of gender.  *See* Pl. Mem. at 3-7.  Accordingly, her claims of gender-based discrimination are abandoned.  *Cf. Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014) ("[A] partial response arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims.").  Even if Richards did not abandon those claims, however, they suffer from the same defects as beset her race-based claims.

### 1. Title VII, ADA, and NYSHRL

Claims arising under Title VII, the NYSHRL, and the ADA "are governed at the summary judgment stage by the burden-shifting analysis first established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)." *Tolbert v. Smith*, --- F.3d ---, ---, No. 14-1012-cv, *slip op.* at 12 (2d Cir. June 24, 2015); *see McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013). "Under *McDonnell Douglas*, a plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination; it is then the defendant's burden to proffer a legitimate non-discriminatory reason for its actions; the final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination." *Abrams v. Dep't of Public Safety*, 764 F.3d 244, 251 (2d Cir. 2014). "Where an employer has acted with discriminatory intent, direct evidence of that intent will only rarely be available, so that 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (quoting *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994)). "Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Id.*

### i. Plaintiff Cannot Establish a *Prima Facie* Case of Discrimination

To make a *prima facie* showing of discrimination, "the plaintiff must demonstrate that: (1) she fell within a protected class under Title VII; (2) she was qualified for the position she held; (3) she was subjected to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 45 (2d Cir. 2015). Defendant does not contest that Richards is a

member of several protected classes, that she was subjected to an adverse employment action,[9] or even that she was qualified for the position that she held.  Def. Mem. at 5-11.  The only dispute is whether any adverse action was taken under circumstances giving rise to an inference of discrimination.

Richards does not contend that Gordon – who is also a black female – made any remarks that tend to show discriminatory animus directed at black people, women, or the disabled.  Instead, she argues that Gordon was unfair to her.  *See, e.g.,* Pl. Mem. at 4 (Gordon's "petty and combative disciplinary letters over minor issues are evidence of discriminatory treatment, harassment, and hostile work environment"); *id.* at 6 ("When Principal Gordon sets up Plaintiff to fail and documents every small mishap as 'insubordination' or incompetence, it raises the inference that Principal Gordon was using these disciplinary letters to make an improper demotion appear justifiable.").

Read generously, Richards' brief could be advancing two arguments:  (1) Richards was treated worse than similarly-situated white[10] employees; and (2) Gordon systematically terminated black employees.  She adduces no evidence that supports either argument, however.  Accordingly, summary judgment is appropriate.

Richards points to three ways in which white employees were treated differently from her.  First, she points out that Gordon "ordered a Blackberry for Dean Migliaccio, a white male, before ordering one for Plaintiff."  Pl. Mem. at 4.  Gordon explained that before she ordered a

---

[9]    It is not clear about which action, precisely, Richards is complaining; she was demoted, but she seems at times to assert that each disciplinary letter that she received was an adverse employment action.  There is no evidence that any was discriminatory.

[10]   Richards does not contend that similarly-situated employees who did not suffer from a disability were treated differently, and she has adduced no evidence showing that the comparators whose cases she discusses were not disabled.  Richards also does not even allege, let alone present evidence to show, that Gordon knew of any perceived disability or regarded her as disabled.  In short, the record contains no evidence that would support the inference that any adverse action was taken because of Richards' alleged disability.

Blackberry for Richards she ordered one for Migliaccio, "who was in the cafeteria often alone." Gordon Dep. at 54.  Once Gordon was able to order a Blackberry for Richards, however, she did so.  *Id.* at 53.  Moreover, Richards admits that she "first requested a Blackberry in writing on March 8, 2010,"[11] the approximate date on which Gordon ordered her Blackberry.  Richards Aff. ¶ 5, *see* Pischl Decl. Ex. HH at 2.[12]  Although Richards argues that Assistant Principal Wynn had a Blackberry far earlier than she, Wynn had a Blackberry before Richards arrived at the school (and therefore at least 19 months before she requested one).  56.1 ¶ 34.  Richards explains that she did not request a BOE-issued Blackberry earlier because Cedeño emailed her less frequently than Gordon.  *See* Pl. 56.1 ¶ 184.  But her sudden "need" for a BOE-issued Blackberry based on her new boss's use of email does not create discrimination where there otherwise was none.  If Wynn and Richards had both asked for Blackberries at the same time, and Gordon had chosen to order one for Wynn first, then Richards *might* have a point.  In light of the fact that there is no dispute that Gordon ordered Richards a Blackberry approximately when she first requested one in writing, the timing of Richards' obtaining a BOE-issued Blackberry does not constitute even circumstantial evidence of race-based discrimination.

Next, Richards argues that she was punished for leaving school when she received a phone call indicating that her terminally-ill mother was in the emergency room.  Although Plaintiff does not attempt to marshal the facts in response to Defendants' motion, *see* Pl. Mem. at 5, she testified at her deposition that some white employees were permitted to leave school for family emergencies without facing disciplinary repercussions, *see* Richards Dep. at 159-61. Richards testified that Gordon approved time for lower-ranking white employees to visit a dying

---

[11]     Richards also asserts that she "feel[s] certain [she] requested it verbally several times before that date." Richards Aff. ¶ 5.

[12]     The BOE typically takes several months to provide a Blackberry after it has been ordered.  56.1 ¶ 38. Richards' Blackberry was available in May 2010.  Pischl Decl. Ex. II.

grandmother, attend a grandfather's funeral, attend to her sister during a heart attack, and attend to a non-English-speaking spouse who broke her legs.  *Id.*  Richards' argument misses the crux of why she was disciplined: it was not because she left work to attend to a family emergency; it was because she left work to attend to a family emergency without seeking permission to leave. Moreover, Richards does not allege that any of the individuals to whom she points as comparators left abruptly during a meeting with the Principal without first seeking permission.[13] The Court agrees that if Richards' version of events is accurate (which the Court must assume at this stage) Gordon was less sensitive than one would like, but insensitivity or even callousness is not actionable under Title VII or the ADA.  "'Insensitivity alone does not amount to harassment; Title I of the ADA, like Title VII of the Civil Rights Act of 1964, is not in effect a 'general civility code.'"  *Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 97 (2d Cir. 2012) (quoting *Cannice v. Norwest Bank Iowa N.A.*, 189 F.3d 723, 726 (8th Cir. 1999) (alterations omitted)).  Nothing suggests that Richards' race – as opposed to her rank of Assistant Principal or the fact that she rudely left a meeting with her boss after answering her personal phone during a work meeting – led to Gordon's dissatisfaction over Richards' abrupt departure.

Richards also asserts that Gordon's evaluations were discriminatory and that Gordon made demands on her time that she did not make of other administrators.  *See, e.g.*, Richards Dep. at 128.  Richards testified that she was never given extensions for her deadlines while the white male Assistant Principal, Wynn, "was given extensions to any deadline he had."  *Id.* at 168.  But Richards also conceded that Wynn was "superbly well organized" and "[a]lways on time 24/7."  *Id.* at 74.  "They called him 'Steve the machine' and he lived up to that name."  *Id.* at 75.

---

[13]     Although Richards contends that she "let [Gordon] know . . . that [she] needed to leave due to [her] mother's emergency hospitalization," she does not allege that she sought permission.  Richards Aff. Ex. F.

Richards finally points to the reassignment of Room 443 to a new, white Assistant Principal, Katherine Stahl, as a sign of Gordon's discrimination. Stahl, who was new to CTEA in the 2010-2011 school year, did take that office – but when Stahl started, Room 443 was a vacant office formerly used by an Assistant Principal (Richards) who was no longer assigned to CTEA. 56.1 ¶¶84-87. Gordon testified that she played no role in any decision to move Richards from Room 443. Gordon Dep. at 130. Richards offers no evidence that tends to prove that Room 443 was allocated to the new Assistant Principal because of her race rather than because it was an available office when the academic year began.

Indeed, assuming the truth of all of Richards' allegations, she would have established enough only to permit a reasonable factfinder to conclude that Gordon is a tough Principal and that Plaintiff may have been treated unfairly. But because she did not adduce any evidence "linking her claims of unfair treatment to her race, color or gender," Richards' claims "rest[] solely on personal disputes that fall outside the scope of Title VII" or the ADA. *Sanders-Peay v. N.Y.C. Dep't of Educ.*, No. 14-CV-4534(CBA), 2014 WL 6473507, at *3 (E.D.N.Y. Nov. 18, 2014).[14]

In a last-ditch effort to create a question of fact whether Gordon was motivated by racial animus, Richards lists the minority women who have left CTEA since Gordon became Principal. *See* Pl. Mem. at 5 (listing 11 minority women who left CTEA during Gordon's 4.5-year tenure); *see also* Gordon Dep. at 82, 86 (identifying Janine Manning and Viola Profit as two minority women who left who are not listed in Richards' brief). But Richards fails to provide any evidence of how many men or white employees left during the same period, what the standard

---

[14]     Richards initially included her inability to attend the United Federation of Teachers ("UFT")'s Consultative Committee meetings as an indication of Defendant's discrimination. Compl. ¶ 42. Gordon testified, and there is no genuine dispute, that attendance at these union meetings was determined by the UFT, which permitted Wynn to attend a meeting based on his informal role as acting principal. Gordon Dep. at 140-41.

rate of attrition is, what the circumstances were governing the departure of the minority women, or any other relevant data points.

There is evidence in the record that several of the women left because they were promoted to Assistant Principal or for other reasons that are indisputably unrelated to any racial animus Gordon may harbor. Gordon Dep. at 82, 84. Only three of the black females (counting Plaintiff) were subject to adverse actions. *Id.* at 107-08. Several of the black females who left – and perhaps others who did not leave – had been hired by Gordon. *Id.* at 109-10. The fact that three minority women were subject to adverse actions during the first 4.5 years of Gordon's tenure as CTEA's Principal does not give rise to an inference that Gordon, herself a black woman, was discriminating against black women – particularly in the absence of any data regarding the number of white people and males who were subject to adverse action during that time period.

Although the plaintiff's burden in establishing a *prima facie* case of discrimination "'has been characterized as 'minimal' and '*de minimis*,'" *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013) (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173) (2d Cir. 2005)), it is not non-existent, *see Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 77 (2d Cir. 2005). Richards has not adduced "'evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion.'" *Id.* at 80 (quoting *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996) (alterations and emphasis omitted)).

### ii. Defendant Has Articulated Legitimate Non-Discriminatory Reasons for the Adverse Actions Taken against Richards

Even if Richards had established a *prima facie* case of discrimination, Defendant contends that Richards' probationary role as Assistant Principal was discontinued because of "her chronic inability to timely complete assigned tasks, her repeated insubordination, and her

inability to maintain a collegial relationship with her coworkers."  Def. Mem. at 11.  Defendant

has adduced evidence showing that several members of the CTEA staff – including the other

Assistant Principal – were uncomfortable working with Richards.  56.1 ¶¶ 93-96.  Moreover,

although Richards contends that Gordon assigned her deadlines that were impossible to meet, she

does not allege that she met them (with the exception of one chart that Gordon commended her

for finishing).   Pl. 56.1 Resp. ¶ 19.  Gordon issued a number of disciplinary letters before taking

adverse action, giving Richards more than ample time to improve her performance as an

Assistant Principal.  Pischl Decl. Exs. C, E, F, O, W, X, Y, Z, AA, XX; *see also id.* Exs. TT and

UU.  When Richards did not use the opportunity to improve, Defendant terminated her

probationary status as an assistant principal and returned her to a teaching position.  Defendant

has persuasively carried its burden of providing a non-discriminatory basis for Richards'

demotion and poor reviews.

### iii.  Plaintiff Has Not Shown Defendant's Reasons to Be Pretextual

"When the employer meets its burden [of articulating a non-discriminatory reason for an

adverse action], the plaintiff can no longer rely on the prima facie case, but 'must prove that the

employer's proffered reason was a pretext for discrimination.'"[15]  *Delaney v. Bank of Am. Corp.*,

766 F.3d 163, 168 (2d Cir. 2014) (*per curiam*) (quoting *McPherson v. N.Y.C. Dep't of Educ.*,

457 F.3d 211, 215 (2d Cir. 2006) (other quotation marks and internal citation omitted)).

Richards asserts that Defendant's proffered basis for her demotion – specifically, her poor

performance – was the product of "impossible work demands and unreasonable deadlines,

designed so that she would fail."  Pl. Mem. at 7.  She points out that Cedeño, Gordon's

predecessor, certified that "Richards worked productively and efficiently and adhered to the

---

[15]     Richards misunderstands her burden at the third step of the *McDonnell Douglas* analysis; she asserts that
"to prevail on a claim of pretext, a plaintiff must show a prima facie case of discrimination, by showing the
circumstances surrounding the adverse action give rise to an inference of discrimination."  Pl. Mem. at 6.

goals that I set for her." Pischl Decl. Ex. Q.  But the fact that one of her bosses found her work to be acceptable does not mean that her subsequent boss's dissatisfaction was a pretext for discrimination.  Gordon provided significant documentation of her dissatisfaction with Richards' performance; Richards has argued that Gordon's dissatisfaction was unfair, but she has produced no evidence that Gordon was using the pretense of Richards' poor performance to permit Gordon to achieve a secret, discriminatory agenda.  Richards has adduced no evidence from which a factfinder could conclude that Gordon's dissatisfaction with Richards' performance was "pretext for discrimination." *United States v. City of New York*, 717 F.3d 72, 102 (2d Cir. 2013).  "It is not a court's role to second-guess an employer's personnel decisions, even if foolish, so long as they are nondiscriminatory." *Dorcely v. Wyandanch Union Free Sch. Dist.*, 665 F. Supp. 2d 178, 193 (E.D.N.Y. 2009).  Accordingly, Defendant is entitled to summary judgment as to Richards' discrimination claims under Title VII, the ADA, and the NYSHRL.

### 2.  NYCHRL

Although the text of the NYCHRL mirrors the NYSHRL, *compare* N.Y.C. Admin. Code § 8-107 *with* N.Y. Exec. Law § 296, in 2005, the New York City Council broadened the protection of the NYCHRL, *see* Local Civil Rights Restoration Act of 2005, N.Y.C. Local L. No. 85 ("Restoration Act").  The Second Circuit therefore requires "'courts [to] analyze NYCHRL claims separately and independently from any federal and state law claims.'"  *Velazco v. Columbus Citizens Found.*, 778 F.3d 409, 411 (2d Cir. 2015) (*per curiam*) (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013)).  Under the NYCHRL, claims are construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible."  *Mihalik*, 715 F.3d at 109 (internal quotation marks and citations omitted)).  Unlike Title VII, the NYCHRL "does not require 'a connection between the discriminatory conduct and a materially adverse employment action.'"  *Garrigan v. Ruby*

*Tuesday, Inc.*, No. 14-CV-155(LGS), 2014 WL 2134613, at *3 (S.D.N.Y. May 22, 2014)

(quoting *Mihalik*, 715 F.3d at 114).  The proper inquiry under the NYCHRL is whether a

plaintiff "was treated 'less well' because of her [membership in a protected class]."  *Mihalik*, 715

F.3d at 111 (quoting *Williams v. N.Y. City Hous. Auth.*, 61 A.D.3d 62, 78 (1st Dep't 2009)

(alteration omitted)).  Although "a jury is often best suited to make this determination, . . .

summary judgment still can be an appropriate mechanism for resolving NYCHRL claims."  *Id.* at

111.  A defendant is entitled to summary judgment "if the record establishes as a matter of law

that discrimination played *no* role in its actions."  *Id.* at 110 n.8 (citing *Williams*, 61 A.D.3d at 78

n.27) (emphasis in original, alteration omitted).

      Richards has adduced no evidence indicating that she "was 'treated less well' because of"

her membership in a protected class.  *Benjamin v. T.U.C.S.*, No. 14-CV-2982(KBF), 2015 WL

3947902, at *5 (S.D.N.Y. June 29, 2015); *see also Varughese v. Mount Sinai Med. Ctr.*, No. 12-

CV-8812, 2015 WL 1499618, at *44 (S.D.N.Y. Mar. 27, 2015).  Nobody made any comments to

her regarding her race, gender, or disability.  Wynn, the closest to a similarly-situated colleague

that Richards identifies, was senior to her, given different assignments, and did superb work by

any measure.  Richards Dep. at 74-75.  Richards alleges that she was given work assignments

that she had no hope of completing and then punished for her failure to complete them, Pl. Mem.

at 6-7; absent racial animus, that is not actionable discrimination even under the NYCHRL.

Accordingly, Defendant is entitled to summary judgment on Richards' NYCHRL discrimination

claim.

### B.  There Is No Evidence of a Hostile Work Environment

#### 1.  Title VII, ADA, and NYSHRL

      "Hostile work environment claims under Title VII and the NYSHRL are governed by the

same standard."  *Tolbert*, --- F.3d ---, ---, *slip op.* at 23.  "To prove a hostile work environment

claim under Title VII, a plaintiff must show that [her] 'workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 113 (2d Cir. 2015) (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993)). "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014). "It is axiomatic that the plaintiff also must show that the hostile conduct occurred because of a protected characteristic." *Tolbert*, --- F.3d at ---, *slip op.* at 23 (citing *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)).

    In her briefing, Richards asserts that Gordon created a hostile work environment by writing false letters-to-file; changing her office; changing Richards' assignments when she had made substantial progress on them; withholding information necessary to perform her duties; imposing unreasonable deadlines; assigning impossible tasks; and once "bumping" Richards with her body to remove Richards from Gordon's office. Pl. Mem. at 10. Richards has established that she subjectively perceived her work environment to be hostile. Nevertheless, Richards has "failed to identify sufficient material facts showing that [her] work environment was objectively hostile and abusive." *Tolbert*, --- F.3d at ---, *slip op.* at 24. Gordon was a demanding boss, but there is no evidence that she adopted an unprofessional tone or made remarks that were unsuitable for a professional environment. *Cf. id.* (defendant's several racist comments did "not qualify as 'a steady barrage of opprobrious racial comments' that altered the conditions of [plaintiff's] employment.") (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir., 1997)); *Wiercinski*, 787 F.3d at 113 ("Relevant factors in determining whether the

conduct is sufficiently pervasive 'include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'") (quoting *Harris*, 510 U.S. at 23).

Although Richards has adduced evidence that Gordon's conduct was "frequent," a pattern of poor reviews is not "severe" mistreatment; the only physically threatening act was the "bumping" in April (which was not substantiated by the BOE's investigation), and to ascribe Richards' poor work performance to Gordon is letting the tail wag the dog. *See Davidson v. Lagrange Fire Dist.*, No. 08-CV-3036(VB), 2012 WL 2866248, at *19 (S.D.N.Y. June 19, 2012), *aff'd*, 523 F. App'x 838, 840 ("Defendants' denial of plaintiff's request for a light duty position, failure to provide plaintiff with email notification of training and study sessions, failure to reimburse plaintiff for medical treatments, and failure to mail her paychecks and provide her with a W-2 form are isolated or episodic incidents and do[] not constitute the type[s] of conduct a reasonable person would find severe or pervasive enough to create a hostile work environment.").

Even if Richards had demonstrated that her work environment was hostile – and she has not –Title VII, the ADA, and the NYSHRL require evidence to support the inference that plaintiff was subjected to a hostile work environment *because of her membership in a protected class*. *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 15 (2d Cir. 2013) (*per curiam*). Here, Richards has not alleged facts, much less adduced evidence, to support her assertion that she was subject to a hostile work environment because of her protected status. If Gordon bullied Richards, her conduct was deplorable, "but unless [it was] motivated by the victim's membership in a protected class," it does not establish a *prima facie* cause of

action under Title VII, the ADA, or the NYSHRL.  *Johnson v. City Univ. of N.Y.*, 48 F. Supp. 3d 572, 574 (S.D.N.Y. 2014).

### 2.  NYCHRL

The NYCHRL permits hostile work environment claims based on a lesser showing than is required by Title VII and the NYSHRL.  *Mihalik*, 715 F.3d at 112-13; *Gonzalez v. EVG, Inc.*, 123 A.D.3d 486, 487 (1st Dep't 2014).  "Under the [NY]CHRL's more liberal standard, a plaintiff must 'show that her employer treated her less well than other similarly situated employees, at least in part for discriminatory reasons.'"  *Bright v. Coca Cola Refreshments USA, Inc.*, No. 12-CV-234(BMC), 2014 WL 5587349, at *2 (E.D.N.Y. Nov. 3, 2014) (quoting *Fenner v. News Corp.*, No. 09-CV-9832(LGS), 2013 WL 6244156, at *13 (S.D.N.Y. Dec. 2, 2013)).

As discussed *supra*, because Richards has adduced no evidence that Gordon's behavior was motivated by "discriminatory animus," her NYCHRL hostile work environment claim fails.[16]  *Askin v. Dep't of Educ. of City of N.Y.*, 110 A.D.3d 621, 622 (1st Dep't 2013).

### C.  There Is No Evidence of Any Failure to Accommodate a Disability

Richards alleges that Defendant discriminated against her based on her "disability" – to wit, her former pregnancy and associated problems of "swollen feet, lower back discomfort and stomach irritation."  Compl. ¶¶ 26-27, 31.  Richards and Cedeño have both attested that they agreed, in 2009, that because Richards was pregnant, she would continue to work in Room 443, which was adjacent to a bathroom and otherwise well located.  Pischl Decl. Exs. P, Q.  Both Richards and Cedeño described Richards' "disability" as "pregnancy."  56.1 ¶¶ 90-91.  Richards

---

[16]     Even if Richards had established discriminatory animus, she has not put forward evidence that would elevate her claim above "petty slights" and into the realm of cases that are actionable under the NYCHRL but not the NYSHRL.  *See, e.g., Gonzalez*, 123 A.D.3d at 487-88 (describing defendants' "constant use of language degrading women, telling of sexually explicit jokes, and overt viewing of pornography in the workplace" as hostile under the NYCHRL but not the NYSHRL).

returned from maternity leave in October 2009 and was assigned to a different office in

September 2010.  Pischl Decl. Ex. P, 56.1 ¶ 84.[17]

Richards alleges that her reassignment to a less-suitable office constituted a violation of

the ADA (and any state and municipal analogs), which prohibit discrimination based on an

employee's disability.  "The ADA and the NYSHRL require an employer to afford reasonable

accommodation of an employee's known disability unless the accommodation would impose an

undue hardship on the employer."  *Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 94 (2d Cir.

2015) (citing 42 U.S.C. § 12112(b)(5)(A) and N.Y. Exec. L. § 296(3)(a)).  "To maintain a claim

under either statute, an employee must show that: '(1) [s]he is a person with a disability under

the meaning of the ADA; (2) an employer covered by the statute had notice of [her] disability;

(3) with reasonable accommodation, the employee could perform the essential functions of the

job at issue; and (4) the employer has refused to make such accommodations.'"  *Id.* (quoting

*McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009) (alterations

omitted)).

Assuming that Richards had a disability, she has not adduced evidence from which a

factfinder could conclude that Defendant had notice of her disability.  *Cf. Medcalf v. Thompson*

*Hine LLP*, --- F. Supp. 3d ---, ---, No. 13-CV-7609(ER), 2015 WL 463809, at *9 (S.D.N.Y. Feb.

4, 2015).  Richards met with Cedeño early in her pregnancy to discuss steps that the Defendant

could take to accommodate her, and the two concluded that Richards could stay in her then-

assigned office.[18]  Pl. 56.1 Resp. ¶¶ 88, 140; Pischl Decl. Ex. Q.  Richards does not, and cannot,

explain how this conversation in March 2009 about a then-existing pregnancy was supposed to

---

[17]    It appears that Richards seeks damages for the period between her return to CTEA on September 27, 2010, and her final departure on November 29, 2010.  *See* Compl. ¶¶ 84, 111, 128; Pl. Mem. at 12.

[18]    Perhaps because her then-assigned office accommodated her temporary disability, Richards did not comply, and Cedeño did not insist that she comply, with BOE policy governing requests for accommodations.  *See* 56.1 ¶¶ 146-48, Pischl Decl. Ex. YY.

place a new principal on notice that, 18 months later, Richards still physically needed to work in

Room 443 even though she was no longer pregnant.  Even if the Court were to ascribe all of

Cedeño's knowledge to Gordon, what Richards would have established is that Gordon knew that

Richards had previously been pregnant, experienced some difficulties during her pregnancy, and

did not need to change offices to accommodate those difficulties.  Richards does not allege that

her lingering "disability" was apparent to Gordon; instead, she asserts that Gordon "should have

known or consulted with Plaintiff" before reassigning her office, notwithstanding the fact that the

apparent disability (pregnancy) that formed the basis for the office being an accommodation had

ended and notwithstanding the fact that the new Assistant Principal claimed Room 443 without

Gordon's knowledge while Richards was on indefinite leave from CTEA.

Of course, beginning September 27, 2010, Gordon knew that Richards claimed to require

an accommodation.  56.1 ¶ 140.  At that point, Gordon had a duty "to initiate 'an interactive

process'" with Richards to evaluate her claim of disability and to discover a reasonable

accommodation.  *Harris v. Mills*, 572 F.3d 66, 75 (2d Cir. 2009).  Gordon indisputably did so –

her assistant emailed Richards the BOE's accommodation request form the day after Richards

asserted that she required an accommodation.  56.1 ¶¶ 140-41.  Richards waited over a month

before completing the form; but when she finally did complete it, she did not describe the

condition she alleged was disabling.  *Id.* ¶¶ 142-44.  One month after Richards completed the

request, she was reassigned to a different school, and her request to work in CTEA's Room 443

became moot.  *Id.* ¶¶ 133, 142.

Richards alleges that the BOE's insistence that she comply with BOE policy governing

requests for accommodation was discriminatory.  Pl. Mem. at 12.  She does not allege, however,

that the policy as a whole is discriminatory – she relies exclusively on the fact that Cedeño

permitted her to skirt the process.  *Id.* at 12-13.  But the fact that the previous principal permitted

Richards to remain in her office without filling out paperwork does not render the new principal's insistence that Richards comply with BOE policy discriminatory.

Finally, Richards' argument that the BOE's delay in evaluating her request for an accommodation was discriminatory is meritless. *Cf. Logan v. Matveevskii*, 57 F. Supp. 3d 234, 271 (S.D.N.Y. 2014) (collecting cases). Any delay beyond one month is irrelevant, as by that time Richards had been permanently reassigned, mooting her request for Room 443 at CTEA. Richards has not adduced any evidence indicating that the delay was a constructive denial or was the result of a discriminatory policy. Accordingly, Defendants are entitled to summary judgment.

## II.   FMLA

Richards' FMLA claims arise from Gordon's disciplining Richards for her abrupt departure from work when her mother was in the emergency room. Compl. ¶¶ 96-100. Defendant asserts that Richards' claim falls outside of the FMLA's statute of limitations and that Richards has otherwise failed to adduce evidence in support of her claim. The events underlying her claim transpired in April 2010. Richards Aff. Ex. K at 4. Richards initiated this action in January 2013.

The FMLA provides for a two-year statute of limitations for standard violations and a three-year statute of limitations for willful violations. *Porter v. N.Y. Univ. Sch. of Law*, 392 F.3d 530, 531 (2d Cir. 2004) (*per curiam*) (citing 29 U.S.C. § 2617(c)(1)-(2)); *see also Mathew v. N. Shore-Long Island Jewish Health Sys.*, No. 11-CV-6022(JBW), 2013 WL 5799883, at *6 (E.D.N.Y. Oct. 23, 2013), *aff'd on other grounds*, 582 F. App'x 70. Accordingly, whether Richards' claim is timely hinges on whether she can establish that Defendants "'knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FMLA].'" *Porter*, 392 F.3d at 531 (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)).

"'If an employer acts unreasonably, but not recklessly, in determining its legal obligation, then it should not be considered willful.'"  *Id.* (quoting *McLaughlin*, 486 U.S. at 135 n.13) (alterations omitted).

Richards barely attempts to establish that Defendant's behavior was willful.  *See* Pl. Mem. at 14.  Richards argues that Gordon should have asked where she was going when Richards abruptly left, without requesting permission,[19] after responding to a cellular telephone call during the middle of a meeting.  *Id.*; 56.1 ¶¶ 44-47.  Although the better practice would have been to ask Richards where she was going, it is not sufficient to establish that Gordon behaved sub-optimally or even unreasonably – she must have been "reckless" with regards to whether her insistence that her employees obtain permission before leaving work had crossed the line from rigid to illegal.  There is no evidence of Richards' willfulness in that regard.  Accordingly, Defendant is entitled to summary judgment as to Richards' FMLA claim.[20]

### III.   Retaliation

#### A.   Richards Has Not Articulated a Claim under Title VII, the ADA, or the NYSHRL

Richards alleges that Gordon retaliated against her based on Richards' claims of discrimination and unlawful employment practices.  *See* Compl. ¶¶ 77-81, 88-95, 105-07, 115-16.  "Federal and state law retaliation claims are reviewed under the burden-shifting approach of *McDonnell Douglas*."  *Kwan*, 737 F.3d at 843.  As with her discrimination claims, Richards has

---

[19]     Richards concedes that she did not ask permission but alleges that, because she announced that she was leaving and was not explicitly forbidden from doing so, she implicitly obtained permission.  Pl. 56.1 Resp. ¶ 47.

[20]     Even if Richards' FMLA claim were timely, Richards has not generated an issue of fact as to whether she was "denied benefits to which [s]he was entitled under the FMLA."  *Achille v. Chestnut Ridge Transp., Inc.*, 584 F. App'x 20, 21 (2d Cir. Nov. 25, 2014) (summary order) (quoting *Higgins v. NYP Holdings, Inc.*, 836 F. Supp. 2d 182, 193 (S.D.N.Y. 2011)).  Although the Second Circuit has "not set out the requirements of a prima facie case on a claim for interference with FMLA rights," *id.*, it has confirmed in summary orders that an "employer may require an employee 'to comply with the employer's usual and customary notice and procedural requirements for requesting leave,'" *Golden v. N.Y.C. Dep't of Envtl. Protection*, 354 F. App'x 577, 579 (2d Cir. Dec. 2, 2009) (quoting 29 C.F.R. § 825.302(d)).  There is no genuine dispute – and Richards does not seem to contest – that Richards' abrupt declaration that she was leaving did not comply with the BOE's requirements for requesting leave.

not established a *prima facie* case or demonstrated that Defendant's proffered non-discriminatory

basis for her demotion was pretextual.

### 1.   Richards Has Not Made Out a *Prima Facie* Case of Retaliation

"To make out a *prima facie* case of retaliation, a plaintiff must demonstrate that '(1) she

engaged in protected activity; (2) the employer was aware of that activity; (3) the employee

suffered a materially adverse action; and (4) there was a causal connection between the protected

activity and that adverse action.'"  *Kelly*, 716 F.3d at 14 (quoting *Lore v. City of Syracuse*, 670

F.3d 127, 157 (2d Cir. 2012)).  Richards points to two occasions on which she alleges that she

engaged in protected activity – first, her March 2010 letter to Gordon, and second, her complaint

to the OEO on September 16, 2010.  Pl. Mem. at 8.

Richards' March letter to Gordon did not constitute protected activity.  In her letter,

Richards wrote to the Principal:

> [Y]our failure to support me as a professional and provide me with my basic
> human rights to work in a hostile-free work environment gives me no hope of you
> assisting me.  Daily, you find ways to detract [sic] me from my work and criticize
> me for not meeting your unreasonable demands.  I've had to use my personal
> vehicle, personal Blackberry, and personal time to enact your vision and it is still
> never good enough.  This year at CTEA has been hard enough and your presence
> has made it an absolutely impossible area to professionally thrive in.  I have the
> right to be treated as a professional and work in a professional atmosphere and am
> requesting that you respect that right henceforth.

Richards Aff. Ex. B at 4.  At no point in her diatribe does Richards allege that the hostility

complained of was the result of her membership in class protected by Title VII, the ADA, or the

NYSHRL.  *Id.*  Richards cannot, therefore, establish that she "'had a good faith, reasonable

belief that she was opposing an employment practice made unlawful by'" any of those statutes.

*Kelly*, 716 F.3d at 14 (quoting *McMenemy v. City of Rochester*, 241 F.3d 279, 285 (2d Cir. 2001)

(alteration omitted)); *see also Wimmer v. Suffolk Cnty. Police Dep't*, 176 F.3d 125, 134-35 (2d

Cir. 1999).  As in *Kelly* and *Wimmer*, Richards' complaint was not predicated on an objectively

reasonable belief that she was the victim of unlawful discrimination.  Plaintiff "might have

believed that any bullying [or hostility], regardless of whether it was motivated by impermissible

discrimination, constituted a violation of Title VII, [the ADA or the NYSHRL,] but a 'mere

subjective good faith belief is insufficient; the belief must be reasonable and characterized by

*objective* good faith.'"  *Johnson*, 48 F. Supp. 3d at 577 (quoting *Kelly*, 716 F.3d at 16) (emphasis

in *Kelly*).  Belief that Title VII, the ADA, or the NYSHRL guarantees a "hostile-free work

environment," irrespective of whether the hostility is motivated by race, gender, or disability, is

objectively unreasonable; accordingly, Richards' March 2010 letter did not constitute protected

activity.

Richards' complaint to OEO, on the other hand, was clearly "protected activity."  She

alleged that since Gordon "arrived at CTEA . . . , she engaged in progressive acts of harassment

toward [Richards] based upon sex/race" and disability.  Pischl Decl. Ex. JJ.  As of October 1,

2010, Gordon was aware of Plaintiff's complaint.  56.1 ¶ 163.  Defendant does not dispute that

the two "Unsatisfactory" ratings that Richards received – given on October 6, 2010, and

November 22, 2010, 56.1 ¶¶ 82, 130 – constituted "materially adverse actions."  *Burlington N. &*

*Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006).  The sole question, then, is whether Richards

can establish the causal link between her complaint and her negative performance evaluations.

Temporal proximity is frequently a device by which plaintiffs establish that their

protected activity led to the adverse action about which they are complaining.  *See Kwan*, 737

F.3d at 845; *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) (*per curiam*).

But temporal proximity is little help here – prior to Richards' complaint, Gordon sought to give

her an "unsatisfactory" review, but "human resources . . . or legal or something told [her that

she] could not evaluate [Richards] at the time . . . because she was out of the building."  Gordon

Dep. at 89-90.  This effort, coupled with the numerous disciplinary letters that Gordon had

written documenting Richards' performance deficiencies and misconduct, eviscerates any inference that the reason she gave Richards an unsatisfactory review was Richards' September complaint to OEO.  *Cf. Abrams*, 764 F.3d at 254-55.

> ### 2.   Richards Has Not Shown that Defendant's Non-Discriminatory Reason for the Materially Adverse Actions Were Pretextual

Even if Richards could establish a *prima facie* case of retaliation, as with Plaintiff's claims of discrimination, Defendant has amply satisfied its burden of showing legitimate, non-discriminatory reasons for the materially adverse actions taken against Richards – Gordon believed that Richards was a poor performer with significant conduct issues.  *See supra* Part I.A.1.  Richards makes three conclusory arguments that Defendant's proffered basis for her demotion was pretextual; none is persuasive.

First, Richards relies on temporal proximity – but "temporal proximity alone is not enough to establish pretext in this Circuit."  *Abrams*, 764 F.3d at 254 (citing *El Sayed*, 627 F.3d at 933).  In this case, because the steady stream of negative feedback *predated* Richards' complaint, temporal proximity is not only insufficient, it is almost entirely meaningless.

Second, Richards alleges that the fact that she received two negative reviews so close together suggests that the reviews were pretextual.  Richards Mem. at 9.  This argument lacks any merit.  Gordon gave Richards her review for the 2009-2010 school year late – she was prepared to complete the review earlier but could not do so because of Richards' temporary reassignment out of CTEA.  Gordon Dep. at 89-90.  Gordon did provide Richards her 2010-2011 review very early, but the record reflects – and there is no dispute – that providing early reviews for Assistant Principals was Gordon's standard practice when the administrators' performance was unsatisfactory.  *Id.* at 43-44.

Finally, Richards claims that her "ratings are so flawed" that they must constitute a pretext for retaliation.  Pl. Mem. at 9.  The consistent documentation of Gordon's dissatisfaction with Richards' performance, however, predated any of Richards' complaints – even her March letter, which was drafted as a response to Gordon's express dissatisfaction with her performance to date.  Pischl Decl. Exs. C, E, F, O, W, X, Y, Z, AA.  Accordingly, there is no evidence that Gordon's negative reviews of Richards were the product of retaliatory animus rather than a reflection of her heartfelt belief that Richards was not performing well in her job.

### B.  Richards Has Not Articulated a Claim under the NYCHRL

"[T]o prevail on a retaliation claim under the NYCHRL, the plaintiff must show that she took an action opposing her employer's discrimination and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik*, 715 F.3d at 112 (internal citations omitted).  In analyzing a NYCHRL retaliation claim, "the totality of the circumstances must be considered because 'the overall context in which the challenged conduct occurs cannot be ignored.'"  *Id.* at 113 (quoting *Hernandez*, 103 A.D.3d at 115).  The totality of the circumstances in this case includes Gordon's well-documented unhappiness with Richards' performance, preceding all of Richards' complaints.  Accordingly, even under the more forgiving NYCHRL standard, Defendants are entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED.

The Clerk of the Court is directed to enter judgment for the Defendant, terminate docket entry 28, and terminate the case.

**SO ORDERED.**

**Date:  July 10, 2015**                                    **VALERIE CAPRONI**
**New York, NY**                                            **United States District Judge**